IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 24-CR-30108 |
| ) | |
| MICHAEL OLIVER, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM & ORDER

A grand jury charged Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant, who is proceeding *pro se*, now moves to dismiss the indictment, arguing that § 922(g)(1) violates the Second Amendment. (Docs. 21 and 37). The Government has responded. (Doc. 46).

The question before the Court is whether, considering the historical framework set forth in in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), § 922(g)(1) is unconstitutional as applied to Defendant.[1] Since § 922(g)(1) does not so violate the Second Amendment, the Motions are **DENIED**.

### I.   BACKGROUND

On August 20, 2024, a federal grand jury returned an Indictment charging Defendant with Unlawful Possession of a Firearm (Lorcin Model L380) by a Convicted

---

[1] Defendant appears to challenge § 922(g)(1) on its face and as applied to him. To succeed on a facial challenge, Defendant must show the statute is unconstitutional in all applications. *City of Los Angeles v. Patel*, 576 U.S. 409, 415, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015). The Court decides the as-applied challenge first because if the as-applied challenge fails then the facial challenge necessarily fails. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012).

Felon in violation of 18 U.S.Cr § 922(g)(1). (Doc. 1). On November 5, 2024, a federal grand jury returned a Superseding Indictment charging Defendant with Unlawful Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e)(2). The Superseding Indictment alleges the following prior felony convictions:

1. Possession with Intent to Distribute a Controlled Substance in the United States District Court for the Eastern District of Missouri on or about September 27, 2005.

2. Aggravated Battery of a Pregnant Person in Alexander County, Illinois, Circuit Court, on or about July 23, 2011.

3. Domestic Battery After a Prior Conviction, in Jackson County, Illinois, Circuit Court, on or about November 15, 2014.

(Doc. 48). The Superseding Indictment further alleges that each of the above offenses was "committed on occasions different from another."

## II. DISCUSSION

Section 922(g)(1), in part, provides: "It shall be unlawful for any person…who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year…to…possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Section 922(g)(1) does not distinguish between violent felonies and non-violent felonies. *See id*. Nor does the Second Amendment, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. Amend. II.

In the last decade or so, much scholarly attention has been paid to the meaning of the words found in the Second Amendment. There is no dearth of recent judicial consideration of both historical and contemporary writings in an effort to understand the

2

import of those words. Given the nature of the analysis required of district courts by *Bruen*, more can be expected. The increase in the number of contests over the constitutionality of § 922(g)(1) is due, at least in part, to the fact that the "means-end scrutiny," such as strict or intermediate scrutiny, does not apply in the Second Amendment context, requiring the Government to affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *See Bruen*, 597 U.S. at 19. As the Supreme Court emphasized in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citing *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n. 10 (1961)); *see United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

While *Bruen* addressed the constitutional right of a citizen to carry a handgun in public, the issue presented here—namely, whether a prohibition of the possession of firearms by a felon violates the Second Amendment—is entitled to the same historical analysis. *See* e.g., *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (finding, since the parties did not grapple with *Bruen*, "[t]he best way forward…[wa]s to return the case to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)").

Accordingly, in the instant case, the Court must decide: (1) whether the plain text of the Second Amendment covers the conduct at issue;[2] and, if so (2) whether the Government can establish that § 922(g)(1) is consistent with the historical tradition of firearms regulation in the United States. *See Bruen*, 597 U.S. at 24. To determine whether § 922(g)(1) is consistent with the country's "regulatory tradition," the Court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29).

### A. The Text of the Second Amendment to the Constitution

The Court finds Defendant is a person included within the term "people," as used in the Second Amendment. The phrase "the people" is used in notable places in the Constitution, and it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (quoting *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). As was emphasized in *Heller*, in all six other provisions of the Constitution mentioning "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. *Id*. Accordingly, there is a "strong presumption that the Second Amendment right is

---

[2] Neither the Supreme Court nor the Seventh Circuit has determined whether the phrase "the people" as used in the Second Amendment includes convicted felons. Most recently, the Seventh Circuit was presented with this question in *United States v. Gay*, 98 f.4th 843 (7th Cir. 2024). In *Gay*, the Seventh Circuit assumed, but did not decide, that the Second Amendment extends to felons. *Id*. at 847.

exercised individually *and belongs to all Americans.*" *Id.* at 581 (Emphasis added.); *see also U.S. v. Ball*, No. 22-cr-449, 2023 WL 8433981, *6 (N.D. Ill. Dec. 5, 2023) ("[N]either *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that 'the people' was limited to law-abiding people.") (Emphasis in original.). The record reflects that Defendant is an American citizen and, therefore, that he is to be afforded the rights available under the Second Amendment, despite his status as a felon. *See Ball*, 2023 WL 8433981 at *7 (concluding that felons are not categorically excluded from the plain textual scope of the Second Amendment).

Further, there appears to be no dispute that the term "arms," as used in the Second Amendment, includes the Lorcin Model L380, allegedly found in Defendant's possession on February 19, 2019. (Doc. 48). The 18th Century meaning of "arms" is no different than the meaning today. *See Heller*, 554 U.S. at 581. An "important" legal dictionary from 1771 defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (quoting 1 A New and Complete Law Dictionary; citing N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Handheld firearms date back to as early as the 17th Century and were common during the years of ratification. Clearly, the Lorcin Model L380 at issue fits within the term "arms," as used in the Second Amendment, and the Government does not argue otherwise here. *See id.* at 582 ("Just as the First Amendment protects modern forms of communications…and the Fourth Amendment applies to modern forms of

5

search…the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). It follows, then, that the Second Amendment presumptively protects the activity of possessing a Lorcin Model L380, and that finding is consistent with *Heller*.

However, § 922(g)(1) excludes from that protected activity those who have been convicted of a crime punishable by more than one year of imprisonment. *See* 18 U.S.C. § 922(g)(1). The potential problem for § 922(g)(1) lies in the fact that its regulation of the Second Amendment right began nearly 200 years after ratification. *See Bruen*, 597 U.S. at 19 (" '[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.' ") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Accordingly, the Government must "demonstrate[e] that it is consistent with the Nation's historical tradition of firearm regulation," and "[o]nly then may [the] court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24. (citing *Konigsberg*, 366 U.S. at 50 n. 10).

### B. *Bruen's* Historical Analysis for Justifying the Regulation of Second Amendment Activities

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Importantly, "[t]here seems…no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited." *Heller*, 554 U.S. at 595. As alluded

6

to above, whether a regulation interferes with that individual right "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. *Bruen* teaches:

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy…. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*See id*. at 28-29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

Recently, in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court considered the constitutionality of 18 U.S.C. § 922(g)(8)(C)(i), which disarms persons against whom a court has issued a restraining order and has found that the person poses "a credible threat to the physical safety" of a protected person. 144 S. Ct. at 1898-99. Applying *Bruen's* historical analysis, the Court upheld the constitutionality of 922(g)(8)(C)(i), and in so doing, clarified the test for assessing Second Amendment challenges, stating:

> [S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber…. [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers…. [T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances…. Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator

7

> that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Id.* at 1897-98 (quotations and citations omitted).

Under this legal framework, historical sources must be sifted through and examined in the search to find reliable indicia of our forefathers' most probable intellectual reactions to the modern regulation or law in question. This process necessarily entails a quarry of analogous, but not entirely identical, legislative artifacts that help to determine the scope of the right, as understood by those who adopted the Amendment. The undersigned recently issued opinions conducting such a historical analysis in the context of similar § 922(g)(1) challenges. *See United States v. Sloat*, 705 F. Supp. 3d 862 (S.D. Ill. 2023); *United States v. Perkins,* 709 F. Supp. 3d 610 (S.D. Ill. 2023); *United States v. Clubb*, No. 3:23-CR-30099-DWD, 2024 WL 167676 (S.D. Ill. Jan. 16, 2024); *United States v. Wiley,* 718 F. Supp. 3d 888 (S.D. Ill. 2024), appeal dismissed, No. 24-1421, 2024 WL 4212901 (7th Cir. Apr. 11, 2024); *United States v. Pierce*, No. 3:23-CR-30046-DWD, 2024 WL 1554835 (S.D. Ill. Apr. 10, 2024). In each opinion, this Court held that the history of the right to keep and bear arms—before, during, and after the Founding Era— provides a sufficient historical tradition to support enforcement of § 922(g)(1). *See* e.g., *United States v. Perkins*, 709 F. Supp. 3d 610, 618 (S.D. Ill. 2023) ("There are ample 'distinctly similar' historical exemplars and models demonstrating individually, and

8

certainly collectively, that regulations disarming disloyal, dangerous, or merely untrustworthy individuals were not uncommon in the early history of our Country.").

The Supreme Court's most recent guidance on this matter, set forth in *Rahimi*, supports the undersigned's reading of the Second Amendment. In *Rahimi*, the Supreme Court traced the history of firearms regulations, and identified a historical tradition of "disarm[ing] individuals who present a credible threat to the physical safety of others." *Rahimi*, 144 S. Ct. 1902. *See also Id.* at 1899-1901 (noting that the Militia Act of 1662 authorized the King's agents to "seize all Armes in the custody or possession of any person…judge[d] dangerous to the Peace of the Kingdom" and that surety and "going armed" laws "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed"). The *Rahimi* Court found that § 922(g)(8), "fits comfortably within this tradition," *id.* at 1897.

The same reasoning applies to § 922(g)(1). The enactment of § 922(g)(1) demonstrates the legislature believes felons are dangerous, and, as recognized in *Rahimi*, this Nation has a tradition of disarming individuals "who present a credible threat to the physical safety of others." *Id.* at 1902. Further, the *Rahimi* Court recognized that "many…prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626-27 n. 26, 128 S.Ct. 2783).

Thus, incorporating the Court's prior reasoning rejecting similar § 922(g)(1) challenges, and applying the legal framework set forth in *Bruen* and *Rahimi*, the Court finds that § 922(g)(1) is part of the Nation's historical tradition of delimiting the outer

bounds of the right to keep and bear arms under the Second Amendment, such that it is not unconstitutional as applied to Defendant – an individual who's underlying convictions include aggravated battery of a pregnant person, domestic battery, and distribution of a controlled substance. Given this finding, Defendant's facial challenge necessarily fails.

### III.  CONCLUSION

For the reasons explained above, the Court **FINDS** § 922(g)(1) does not violate the Second Amendment on its face or as applied to Defendant. Accordingly, the Motions to Dismiss the Indictment (Docs. 21 and 37) are **DENIED**.

**SO ORDERED.**

Dated: November 13, 2024

*s/ David W. Dugan*
DAVID W. DUGAN
United States District Judge